# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **MATTHEW S. LOGUE** *et al.*, | * | |
| Plaintiffs | * | |
| v. | * | **CIVIL NO. JKB-16-3937** <br> **(consolidated with 17-2097)** |
| **PATIENT FIRST CORPORATION** *et al.*, | * | |
| Defendants | * | |

## MEMORANDUM AND ORDER

### *I. Background*

This consolidated medical malpractice suit seeks damages for the death of Shelby Ann Logue on May 20, 2014, one day after she had undergone surgery, specifically, a tonsillectomy, septoplasty, and inferior turbinate reduction. (3d Am. Compl. ¶¶ 10, 43, 86, 88, ECF No. 71.) The Plaintiffs are her surviving family members and the potential beneficiaries of her estate, and they are citizens of either Pennsylvania or Kentucky. (*Id.* ¶¶ 11-13.) Plaintiffs initially filed two lawsuits, one in Pennsylvania and one in Maryland. The first case was brought in Pennsylvania state court on April 1, 2016, against Patient First Corporation; Patient First Urgent Care, East York; Esmeralda del Rosario, M.D.; Cardiac Diagnostic Associates, P.C.; and John J. Bobin, M.D. (Notice of Removal, ECF No. 1, Civ. No. 16-1823-JEJ, M.D. Pa.) The latter two parties were Pennsylvania citizens, but Plaintiffs voluntarily dismissed them, which left only Defendants of either Virginia or Maryland citizenship in the case and resulted in its removal on September 9, 2016, to the United States District Court for the Middle District of Pennsylvania. (*Id.*) That case

was transferred to this Court on July 26, 2017, and docketed as Civil Action Number 1:17-cv-02097 (*see* 17-2097, ECF Nos. 30, 31).

The second case was brought in this Court on December 8, 2016, against Patient First Corporation; Patient First Urgent Care, Bel Air; Boris Gronas, D.O.; Drs. Gehris, Jordan, Day & Associates, LLC; Katherine V. Day, M.D.; SurgCenter of Bel Air, LLC; American Anesthesiology of Maryland, P.C.; Paul D. Gilmore, M.D.; and Patient First Maryland Medical Group, PLLC.[1] (16-3937, ECF Nos. 1 (original complaint), 71 (3d Am. Compl.).) It was consolidated with Case Number 17-2097 on September 27, 2017. (ECF No. 83.)

Now pending before the Court are motions for summary judgment filed by Boris Gronas, D.O., and Patient First Maryland Medical Group, PLLC ("PF Maryland" and, with Gronas, "PF Maryland Defendants")) (ECF No. 129); Esmeralda del Rosario, M.D., and Patient First Pennsylvania Medical Group, PLLC ("PF Pennsylvania" and, with del Rosario, "PF Pennsylvania Defendants") (ECF No. 132); and SurgCenter of Bel Air, LLC ("SurgCenter") (ECF No. 133). They have been briefed (ECF Nos. 138, 139, 142, 143, and 144) and are ready for decision. No hearing is necessary. Local Rule 105.6 (D. Md. 2018). The motions will be denied.

## II. *Standard for Summary Judgment*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute

---

[1] Patient First Corporation and Patient First Urgent Care, Bel Air, were terminated as improperly sued parties, and Patient First Maryland Medical Group, PLLC, replaced them in Civ. No 16-3937. (ECF Nos. 71, 105, 117.) A similar issue regarding proper defendant parties is noted in the consolidated case. The Clerk will be directed to amend the docket to reflect the correct name of the corporate entity, Patient First Pennsylvania Medical Group, PLLC, in Civ. No. 17-2097 and to terminate Patient First Urgent Care, East York. Patient First Corporation, improperly named as a Defendant in both suits, has already been terminated from the case as a party.

2

of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

## III. Evidence

Mrs. Logue was seen on January 15, 2014, by Dr. Katherine V. Day at Drs. Gehris, Jordan, Day and Associates, LLC ("Gehris LLC"), in Bel Air, Maryland. (Pls.' Opp'n to PF Maryland Defs.' Mot. Summ. J., Ex. C, Gehris LLC med. records at 4, ECF No. 138-4.) The Gehris LLC medical practice lists its specializations as head and neck surgery, ear, nose, and throat surgery, and plastic and reconstructive surgery. (*Id.*) Mrs. Logue was not referred by anyone to Dr. Day. (*Id.*) The reason for her visit that day was

> <u>Nasal obstruction</u> is described as the following:
> The patient has constant nasal congestion. She has some problems when she eats bread with swallowing. It will give her the hiccups. She will feel like she needs a drink. She also may have sleep apnea. She snores and has gasping episodes. She was told she had a deviated septum. She takes Afrin.

3

(*Id.*) No evidence has been presented to the Court that Dr. Day's notes as to the medical history provided by Mrs. Logue, including the possibility of sleep apnea and that "[Mrs. Logue] snores and has gasping episodes," were shared with any other medical provider made a Defendant in this case, other than the logical inference that her notes existed at the Gehris LLC office in which Dr. Day practiced.

Her medical history was noted by Dr. Day also to include asthma, diabetes mellitus, and thyroid disease. (*Id.* at 4.) At the time of Dr. Day's examination of Mrs. Logue, she indicated she had experienced fatigue, appetite loss, weight gain, "feeling sick," persistent infections, dry skin, nasal congestion, hoarseness, sore throat, snoring, cough, sleep disturbance due to breathing, abdominal pain, difficulty swallowing, nausea, vomiting, "frequency, nocturia, and urgency," muscle pain, back pain, joint stiffness, muscle cramps, headaches, tingling, and cold intolerance. (*Id.* at 5.) Her weight was noted as 230 pounds, and her height was 63 inches. (*Id.*) Her body mass index was 40.74 kg/m$^2$. (*Id.*) She had a regular pulse of 92, and her blood pressure was recorded as 125/86. (*Id.*) Dr. Day performed a nasal endoscopy and a fiberoptic laryngoscopy. (*Id.* at 6.) Mrs. Logue's nasal septum was deviated to the right, and the deviation was characterized as moderate. (*Id.*) Her left and right tonsils were noted to be "+3." (*Id.*) With regard to the possibility of Mrs. Logue having sleep apnea, the following exchange occurred at Dr. Day's deposition:

> Q. After completing your exam, did you determine what was your differential diagnosis for Mrs. Logue?
>
> A. I thought, well, the patient had a nasal obstruction. She had a deviated septum. She had inferior turbinate hypertrophy. She had rhinitis medicamentosa which is part of the inferior turbinates being swollen from using the Afrin and she had difficulty swallowing of unknown cause.
>
> Q. What, if anything, did you determine about her possible sleep apnea that you had noted earlier?

4

> A. So she had no evidence for any area of airway obstruction on her exam. So there was no evidence of sleep apnea.
>
> Q. What [*sic*] you say there's no evidence of obstruction, that would be evidence of sleep apnea?
>
> A. Yes.
>
> Q. Is there a specific obstruction that you would be looking for that would make it sleep apnea?
>
> A. There are, yes.
>
> Q. Tell me what those are please.
>
> A. So when you examine a patient, what you'll often see is you'll see a smaller oropharyngeal inlet. You'll see a lot of redundant issue [*sic*] in the pallet [*sic*]. You'll see an enlarged base of tongue. You'll see a lot of redundant tissue in the hypopharynx, which is the area further down the throat. All that area was patent. She had no—if there was an area of obstruction, it would have been documented and then that would have been part of my differential. But she had no—Mrs. Logue had no evidence of any obstruction. The only obstruction on her exam was her deviated septum and her enlarged turbinates.
>
> Q. Those obstructions would not cause sleep apnea?
>
> A. No.
>
> Q. How so?
>
> A. So multiple studies have been shown that if someone does have sleep apnea, if you treat the deviated septum and the inferior turbinates, it does not change the sleep apnea at all. . . . You can do nasal airway surgery on patients with sleep apnea to improve their nasal airway and improve their quality of life, but you can't do . . . it and say you're treating sleep apnea.

(Pls.' Opp'n to PF Maryland Defs.' Mot. Summ. J., Ex. D, Day Dep. 75:8—77:12, ECF No. 138-5).

Dr. Day ordered a "CT MAXILLOFACIAL W/O CONTRAST (70486) Routine" and a "MODIFIED BARIUM SWALLOW (74230) Routine." (*Id.*, Gehris LLC med. records at 6.) She prescribed a prednisone pack and nasal steroids; "[i]f no better in 3 weeks, [Mrs. Logue] will get

5

CT sinus." (*Id.*) The steroids were prescribed in an effort to get Mrs. Logue off of the Afrin, with the possibility that would be all she would need to solve the nasal obstruction problem; the modified barium swallow was aimed at determining whether a neurological problem was causing Mrs. Logue's reported difficulty in swallowing. (Day Dep. 77:17—80:2.) Dr. Day also prescribed an antibiotic, Zithromax, to treat any low-level infection that might be contributing to Mrs. Logue's nasal obstruction. (*Id.* 81:4-9.) The CT scan was ordered in the event the steroids and other prescriptions were not successful in improving her breathing. (*Id.* 80:3-11.)

Mrs. Logue saw Dr. Day again on March 13, 2014. Her medical history was largely the same as on her prior visit, except it now included "deviated nasal septum – moderate . . . and hypertrophy of nasal turbinates." (*Id.*, Gehris LLC med. records at 7.) Dr. Day noted, "We treated her with steroids which blew her sugar up and she still cannot breathe." (*Id.*) At that visit, Dr. Day no longer thought Mrs. Logue had rhinitis medicamentosa because "her turbinates had not responded to the standard therapy." (Day Dep. 88:11-14.) But "[s]he was still having nasal obstruction. She was still having difficulty sleeping due to the nasal obstruction. She was also— she had had the swallow study, but she did not show any evidence of any obstructions or problems with the swallowing. . . . She also had a CAT scan which did not show additional sinus disease or other anatomic abnormalities in the nasal cavity." (*Id.* 88:14-19; 89:4-6.) An additional reason for this visit to Dr. Day was noted: "*Pharyngitis* is described as the following: The patient gets 3-4 sore throats a year every year for more than three years. One or two are strep." (*Id.*, Gehris LLC med. records at 7.) For Mrs. Logue's hypertrophy of nasal turbinates, Dr. Day recommended septoplasty and "SMRIT."[2] For the chronic pharyngitis, Dr. Day recommended a tonsillectomy. (*Id.* at 8.)

---

[2] Although the nature of an "SMRIT" is not indicated in this Gehris LLC record, the Court infers it is a surgical procedure related to reduction of the turbinates, which were indicated to be hypertrophic. In SurgCenter's

6

Surgery was scheduled for April 21, 2014, at SurgCenter of Bel Air, Maryland. (SurgCenter's Mot. Summ. J., Ex. C, SurgCenter med. records at 10, ECF No. 133-5.) On March 26, 2014 (and later on April 29, 2014), Dr. Day wrote orders for Mrs. Logue to obtain pre-op testing—noting she was scheduled for a tonsillectomy, septoplasty, and submucous resection inferior turbinate reduction—to include a history and physical, an EKG, and other laboratory tests; Dr. Day did not request pulmonary clearance. (Pls.' Opp'n to PF Maryland Defs.' Mot. Summ. J., Ex. B, Patient First med. records at 60 & 66, ECF No. 138-3.) On the day of the surgery, Dr. Day did not review other providers' preoperative clearances because that information goes to the surgery center; she testified, "[t]he primary care doctor will clear them for surgery and then anesthesia does the second clearance. So I'm not involved in deciding if the patient is cleared for surgery . . . that's not part of what I do." (Day Dep. 106:10—107:5.) The reports sent to her office are routed to the surgery center if they are related to presurgical matters; if reports relate to something she has ordered, such as the CAT scan or the swallow study, then those are routed to her. (Id. 108:16—109:5.) The same is true of the preoperative history and physical and lab results from Patient First; those "would have gone straight to the SurgCenter." (Id. 109:6-17.)

On April 4, 2014, Mrs. Logue visited Patient First – Bel Air with a complaint of congestion. (SurgCenter's Mot. Summ. J., Ex. B, Patient First med. records at 11, ECF No. 133-4.) The medical record indicated she was the source of her medical history and also indicated she did not have a family physician. (Id.) The record notes,

> Comes in with dry cough for the past 1 week. Also developed chest heaviness for the past 2 days. Has been taking Mucinex and cough syrup OTC without help. Initially had a lot of sinus congestion, does not have it right now. Symptoms worse at nighttime.

---

records, SMRIT corresponds to "Submucous Resection Inferior Turbinate." (SurgCenter's Mot. Summ. J., Ex. C, SurgCenter med. records at 10, ECF No. 133-5.) The same terminology was used in Dr. Day's orders for pre-op testing. *See infra.*

7

(*Id.*) Mrs. Logue was observed to have a congested nose and erythema in her throat, and she was diagnosed with acute bronchitis. (*Id.*) The physician signing the record was Bhagya J. Pallerla. (*Id.*) Mrs. Logue was given a prescription for Omnicef and was advised to follow up if not better in three days. (*Id.*)

On April 13, 2014, Mrs. Logue visited Patient First – East York, and the medical record notes,

> Presents complaining of cough x2 weeks. Cough is productive of yellow mucus at times. Feels intermittently short of breath and wheezy with the cough. Is unsure of fevers. Also has associated nasal congestion. Was treated recently with 10 days of Omnicef. Got some better. However, symptoms quickly returned. Has taken prednisone in the past and steroids and it does not have a great effect on blood sugars.

(*Id.* at 12.) Mrs. Logue was prescribed an Albuterol inhaler, a Medrol DosePack, and Zithromax, and she was directed to follow up with Patient First or her primary care provider if no improvement in two to three days or sooner with worsening symptoms. (*Id.*)

On April 17, 2014, Mrs. Logue visited Patient First – East York to have a pre-op physical. (PF Penn. Defs.' Mot. Summ. J., Ex. D, Patient First med. records at 57, ECF No. 132-7.) The medical record noted she had Type 1 diabetes mellitus, uncontrolled, and that she usually sees an endocrinologist for that. (*Id.*) It noted she was taking Zithromax for bronchitis, but that her lungs were "[c]lear to auscultation. No crackles. No wheezing." (*Id.*) An electrocardiogram taken that day, however, produced an abnormal reading: "ECG—Sinus Tachycardia – Negative T-waves – Anterior ischemia." (*Id.*) The physician, Dr. Esmeralda del Rosario, did not clear Mrs. Logue for surgery, instead "strongly recommend[ing]" that she obtain cardiac clearance prior to surgery because of the abnormal EKG and "considering patient is diabetic." (*Id.* at 56.) Dr. del Rosario also "[a]dvised patient to get a note from [her] endocrinologist to note that her diabetes is under control." (*Id.*) Patient First – East York faxed the abnormal EKG and the record of the pre-op

8

physical to Dr. Day's office. (*Id.*) The record further noted that Mrs. Logue called back the next morning to say she was unsuccessful in getting an appointment with a cardiovascular specialist, at which point a nurse at Patient First – East York called Dr. John Bobin's office and arranged an appointment to occur around noon the same day. (*Id.*) The same records sent to Dr. Day's office were also faxed to Dr. Bobin's office. (*Id.* at 56-57.) After Dr. Bobin had conducted his examination of Mrs. Logue, the Patient First – East York record noted, "Received fax from Cardiac Diagnostic for cardiac clearance, faxed copy to pre-op physician for review at [Dr. Day's fax number]." (*Id.* at 57.)

Dr. Bobin examined Mrs. Logue on April 18, 2014, and on April 21, 2014, faxed a copy of his results to Dr. Day's office. (SurgCenter's Mot. Summ. J., Ex. C, SurgCenter med. records at 68, ECF No. 133-5.) Dr. Bobin noted as to the history Mrs. Logue provided him, "She does get shortness of breath and attributes this to reactive airway disease and a recent bronchitis." (*Id.* at 66.) She indicated her respiratory concerns were "wheezing, persistent cough." (*Id.* at 67.) She told him she would not be able to walk adequately for a regular stress test; therefore, he was going to see if she could be scheduled for a dobutamine stress echocardiogram. (*Id.* at 68.) "Should this prove to be normal from a cardiovascular standpoint, she would be acceptable [for surgery]. The next question would be if from a reactive airway standpoint, she would be an optimal surgical candidate. Once we get the results of the stress echocardiogram, we will provide further recommendations." (*Id.*) An addendum indicated the April 18, 2014, stress test "shows negative stress echocardiogram for inducible ischemia and a normal baseline 2-dimensional echocardiogram. The patient is a low risk surgical candidate from a cardiac standpoint; however I am more concerned with her respiratory status than her cardiac status at this point in time." (*Id.*) Mrs. Logue's surgery was rescheduled for May 19, 2014. (*Id.* at 10.)

9

On May 14, 2014, Mrs. Logue visited Patient First – Bel Air to have a pre-op physical. (*Id.*, Ex. B, Patient First med. records at 17, ECF No 133-4.) The history she provided to the examining physician, Dr. Boris Gronas, indicated she had "a history of frequent strep throat infections. Denies any chest pain, shortness of breath, headache or weakness." (*Id.*) Dr. Gronas determined her lungs were "[c]lear to auscultation." (*Id.*) After receiving laboratory results on May 15, 2014, Dr. Gronas assessed Mrs. Logue as a low risk for surgery, and the pre-op record was faxed to Dr. Day's office. (*Id.* at 18.)

On May 16, 2014, Mrs. Logue was seen at SurgCenter—where the operations were to be performed—by Dr. William Loeliger, who is an anesthesiologist employed by American Anesthesiology of Maryland. (*Id.* Ex. C; Ex. D, Loeliger Dep. 31:1-2, ECF No. 133-6.) The purpose of Dr. Loeliger's examination was to conduct an airway check, which is triggered by any patient that has a BMI (body mass index) greater than 40. (Loeliger Dep. 15:18—16:4.) Mrs. Logue's records included two different BMI calculations, one for 40 and one for 42. (*Id.* 16:1-3.) Dr. Loeliger recalled that Mrs. Logue "was not happy about having to have come in for that preoperative exam. She seemed very annoyed by the whole process, and she was very impatient to get out as quickly as possible." (*Id.* 14:3-6.) He said he spent a little time explaining the purpose of the visit to Mrs. Logue and "tried to . . . get her to relax a little bit because she was . . . a little bit agitated about the whole process and having to be there . . . ." (*Id.* 16:16-21.) Dr. Loeliger stated, "[T]he airway check is done primarily to look at the patient's airway, which means, you know, their—our ability to secure an airway during the procedure specifically, you know, intubate the patient." (*Id.* 16:4-8.)

Dr. Loeliger recalled in his examination of Mrs. Logue that the first thing he discussed with her was the postponement of the original surgery date. (*Id.* 17:3-7.) She indicated the reason for

10

the postponement "was . . . because she had an episode of bronchitis and was having a lot of coughing and some wheezing at that time . . . ." (*Id.* 17:7-10.) Dr. Loeliger said he focused on the cardiologist's report in which he expressed concern about Mrs. Logue's respiratory status. (*Id.* 17:10-15.) He then asked her,

> was she still experiencing any shortness of breath, [was] she having coughing, you know, related to this, and she denied all of that. She denied any shortness of breath, she denied any ongoing coughing. I asked her if she felt that she had fully recovered from the bronchitis. She told me that she had.
>
> I then asked her some specific questions about—because anytime you have a patient, especially an obese patient, morbidly obese patient with a BMI over 40, sleep apnea is always a concern. So I asked her some questions specifically to see whether she had any symptoms related to sleep apnea. So I asked her about whether she had knew [*sic*] that she had problems with snoring and she'd ever been told she had snoring, whether anyone had ever observed her to stop breathing for a brief period of time during sleep. I asked her about daytime sleepiness, and she denied all of those, very quickly, by the way. She just said, no, absolutely not.

(*Id.* 17:16—18:13.)

Dr. Loeliger examined her airway and determined that she was potentially a difficult candidate for intubation, but felt that the anesthesiologist who would be assigned to Mrs. Logue's surgery, Dr. Paul Gilmore, could take some extra precautions and "get her intubated without too much difficulty." (*Id.* 18:14—20:21.) Instead of writing a note in the chart, Dr. Loeliger called Dr. Gilmore with that information. (*Id.* 20:6-21.)

Dr. Gilmore is also employed as an anesthesiologist with American Anesthesiology of Maryland. (*Id.*, Ex. E, Gilmore Dep. 23:12-20; 24:25—25:9.) He was the attending anesthesiologist for the surgery. The anesthesia record from the day of surgery, May 19, 2014, indicates Mrs. Logue provided her history of respiratory concerns including asthma, bronchitis, and pneumonia. (*Id.*, Ex. C, SurgCenter med. records at 54.) It notes her oxygen saturation level prior to surgery was 98%. (*Id.*) Her history also indicates she had previously had anesthesia

11

without complications. (*Id.*) The record shows Dr. Gilmore had no difficulty in intubating Mrs. Logue. (*Id.* at 59) It also indicates Mrs. Logue was extubated while awake after surgery. (*Id.*)

While Mrs. Logue was in the post-operation recovery unit, slight wheezing was noted in her upper lobes, and she was given Albuterol at Dr. Gilmore's direction. (*Id.* at 55.) Additionally, her oxygen saturation level fluctuated between 88% and 97%, dropping when she was falling asleep; Dr. Gilmore and Dr. Day were informed of that. (*Id.*) The range of normal oxygen saturation for most patients is 95% or above. (*Id.*, Ex. K, Day Dep. 50:2-17, ECF No. 133-13.) Phyllis B. Jones, a registered nurse in the post-operation recovery unit, testified Mrs. Logue was discharged when her oxygen saturation level was within established parameters and her vital signs were stable. (*Id.*, Ex. H, Jones Dep. 40:11-12; 41:3-18, ECF No. 133-10.) By 2:45 p.m. on May 19, her oxygen saturation was within a range of 90%–95%–100%. (*Id.*, Ex. C, SurgCenter med. records at 55.) Mrs. Logue was then discharged home with instructions to sleep in a recliner with her head at an angle of more than 45 degrees above her body. (*Id.* at 55, 58.)

In her deposition, Dr. Day testified,

> I do have all my postoperative nasal cases sleep propped up. So I did remind [Dr. Gilmore] that she needs to sleep propped up. [Explaining the reason for that, she said,] It's because when patient[s] have nasal surgery, they are going to have nasal bleeding for a few days and I don't want the blood collecting in the back of their throat. I want it to drain . . . more forward. . . . That's standard postop nasal surgery for me and for most ENTs.

(Day Dep. 125:20—126:11.)

The Logues arrived home in Stewartstown, Pennsylvania, from the SurgCenter around three or three-thirty in the afternoon of May 19. (Pls.' Opp'n to PF Maryland Defs. Mot. Summ. J., Ex. A, Logue Dep. 33:22—34:2; 61:4—9, ECF No. 138-2.) Mr. Logue remembered Mrs. Logue had to be propped up, so she "set up on the corner of the couch." (*Id.* 64:17-20.) "[H]er legs were lengthwise on the couch, and she was sitting against the back and the, like the L part of

the couch." (*Id.* 72:9-11.) One of the children had soccer practice, so Mr. Logue left between five and five-thirty for that, arriving back home about eight or eight-fifteen. (*Id.* 64:22—65:17.) Mrs. Logue's mother was at the house while Mr. Logue was at soccer practice; when he returned, he took his mother-in-law home, which was five minutes away. (*Id.* 65:18—66:1.) Mrs. Logue was still on the couch when he and the children took care of their evening activities such as homework, baths, etc. (*Id.* 65:16—66:8.) About eleven o'clock that night, Mr. Logue checked on Mrs. Logue, gave her a kiss, asked if she needed anything, and "she said she was good"; he then went upstairs with one of the children and fell asleep. (*Id.* 66:11-15.) He awakened and looked at the clock, which showed the time as 3:33. (*Id.* 69:22—70:1.) He went downstairs and saw that Mrs. Logue was slumped over "[a]nd like a lot of snot bubbles coming from her nose, and she looked, I don't know, gray, blue. I yelled at her, like tried to wake her up." (*Id.* 70:3-7.) Blood was also coming out of her nostrils. (*Id.* 74:10-15.) He yelled at one of his children to dial 911 and then he pulled her off the couch to the floor and started CPR, but never found a pulse. (*Id.* 70:7-10; 73:16-20.) Medics showed up and, after examining her, said they were sorry, there was nothing they could do. (*Id.* 70:13-21.)

Later in the morning on May 20, 2019, an autopsy was performed. (SurgCenter Mot. Summ. J., Ex. C, SurgCenter med. records at 29-31.) The pathologist reported Mrs. Logue's cause of death as "arteriosclerotic cardiovascular disease, chronic lung disease, and obesity. Hypothyroidism and diabetes mellitus are considered to be contributing conditions." (*Id.*) More specifically, the pathologist noted Mrs. Logue had multi-vessel coronary atherosclerosis and aortic atherosclerosis, chronic airway inflammatory changes and pulmonary arteriolosclerosis, hepatic steatosis, lymphocytic thyroiditis (Hashimoto's), and polycystic ovarian changes. (*Id.* at 29-30.)

13

He also reported, "[n]o gross changes indicative of post-surgical complications to explain death." (*Id.*) He further noted:

> Post-mortem toxicology detected oxycodone and hydrocodone within the decedent's blood. Both were present at individually therapeutic levels. However, according to medical records available to me, the decedent was only prescribed oxycodone for the management of post-operative pain. According to available records, I am not aware that she was prescribed hydrocodone by a physician. If the decedent had been prescribed and using hydrocodone in the days prior to the surgical procedure and her death, the presence of hydrocodone in her blood after death is not necessarily concerning. If she had used both medications immediately prior to her death—without specific direction by a physician(s) to concurrently use oxycodone and hydrocodone—opioid abuse might also be considered a contributing condition.

(*Id.* at 31.)

Various experts for the Plaintiffs have weighed in on the cause of death. Dr. Scott Manaker, opined that Mrs. Logue had undertreated asthma and undiagnosed obstructive sleep apnea ("OSA") and that she died from postoperative hypoxia, attributable to undertreated asthma and/or undiagnosed OSA. (*Id.*, Ex. F, Manaker Rep't at 5, ECF No. 133-8.) Dr. Martin Trott opined that "Mrs. Logue died as a result of prolonged hypoxia induced by depressed respirations and diminished respiratory status related to her sleep disturbance, asthma and the narcotic pain medications she was given and prescribed post-operatively." (PF Penn. Defs.' Mot. Summ. J., Ex. J, Trott Rep't at 4,[3] ECF No. 132-13.) And Dr. E. Andrew Ochroch opined, "Mrs. Logue died of an unstable airway. As she did in the PACU [Pre-Operative/Post-Anesthesia Care Unit] immediately before her discharge, she hypoventilated and desaturated. The combined effects of her opioids, rising carbon dioxide level and falling oxygen level led to her cardiovascular collapse." (Pls.' Opp'n to PF Maryland Defs.' Mot. Summ. J., Ex. M, Ochroch Rep't at 5, ECF No. 138-14.)

---

[3] The Court uses the ECF page number in this instance because the report's pages are not otherwise numbered.

Additional opinion evidence bore upon the standard of care applicable to various Defendants and whether Defendants complied with those standards. (*See* Manaker Rep't, cited *supra*; Ochroch Rep't, cited *supra*; Trott Rep't, cited *supra*; Genecin Rep't, Pls.' Opp'n to PF Maryland Defs.' Mot. Summ. J., Ex. Q, ECF No. 138-18; Maksym Rep't, *id.*, Ex. L, ECF No. 138-13; Balogun Rep'ts, PF Penn. Defs.' Mot. Summ. J., Ex. B, ECF No. 132-5, Ex. I, ECF No. 132-12; Borodulia Rep't, *id.*, Ex. R, ECF No. 132-21.)

## IV. Analysis

### A. Conflicts of Law

Mrs. Logue died at her home in Pennsylvania, while various actions taken by individual Defendants occurred in Maryland and Pennsylvania. Thus, the question arises as to whether the substantive law of Maryland or Pennsylvania governs this case. Sitting in diversity, a federal court applies the law of the forum state, which, in this case, is Maryland. *Erie R.R. Co. v. Tompkins*, 304 U.S 64, 78 (1938). In applying the forum state's law, this Court is also bound to apply Maryland's rules for choice of law. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *DiFederico v. Marriott Int'l, Inc.*, 714 F.3d 796, 807 (4th Cir. 2013).

The causes of action in this case are negligence and wrongful death based upon alleged medical malpractice by the Defendants. As those are both tort claims, the Court must apply Maryland's rule of *lex loci delicti*. The basic rule is that the substantive rights of the parties "'are to be determined by the law of the state in which the alleged tort took place.'" *Philip Morris Inc. v. Angeletti*, 752 A.2d 200, 230 (Md. 2000) (quoting *White v. King*, 223 A.2d 763, 765 (Md. 1966)). "The tort is complete only when the harm takes place, for this is the last event necessary to make the actor liable for the tort." Herbert F. Goodrich, Handbook of the Conflict of Laws § 93, at 263-

15

64 (3d ed. 1949), *quoted in Angeletti*, 752 A.2d at 232. "The place of injury is also referred to as the place where the last act required to complete the tort occurred." *Angeletti*, 752 A.2d at 231.

In Maryland, the elements of negligence are a duty of care owed by a defendant to the plaintiff, breach of that duty, and damage to the plaintiff proximately caused by breach of the duty of care. *Copsey v. Park*, 160 A.3d 623, 636 (Md. 2017). Pennsylvania is similar: "In order to establish a *prima facie* case of malpractice, the plaintiff must establish: (1) a duty owed by the physician to the patient; (2) a breach of that duty; (3) that the breach of duty was the proximate cause of the harm suffered by the patient; and (4) that the damages suffered were a direct result of that harm." *Mitchell v. Shikora*, 209 A.3d 307, 314 (Pa. 2019). In both instances, the tort is not complete until the damage occurs. It is unquestionable that Mrs. Logue's death is the damage at issue and, therefore, the last act needed to complete the alleged torts committed by Defendants. Thus, under Maryland's *lex loci delicti* rule, her death in Pennsylvania mandates reference to Pennsylvania's substantive law for resolution of the three, pending dispositive motions.[4]

### B. Standards Applicable to Claimed Medical Malpractice

Pennsylvania law requires a plaintiff claiming medical negligence to "prove, *inter alia*, that the defendant's treatment fell below the appropriate standard of care—that is, varied from accepted medical practice." *Id.* at 314-15. In *Mitchell*, the court noted,

> "a physician is neither a warrantor of a cure nor a guarantor of the result of his treatment." *Collins[ v. Hand]*, 246 A.2d [398] at 400-01 [(Pa. 1968)]; 40 P.S. § 1303.105 ("In the absence of a special contract in writing, a health care provider is neither a warrantor nor a guarantor of a cure."). Specifically, there is no "presumption or inference of negligence merely because a medical procedure terminated in an unfortunate result which might have occurred despite the exercise of reasonable care." *Collins*, 246 A.2d at 401; *Toogood[ v. Owen J. Rogal, D.D.S., P.C.]*, 824 A.2d [1140] at 1150 [(Pa. 2003)] ("There is no requirement that [a physician] be infallible, and making a mistake is not negligence as a matter of law.

---

[4] Although Plaintiffs recognized the conflicts question as an issue in relation to the PF Pennsylvania Defendants, briefing the question in their opposition to Defendants' motion (at 16), Maryland's law was applied by the parties in all other motion papers filed.

16

In order to hold a physician liable, the burden is upon the plaintiff to show that the physician failed to employ the requisite degree of care and skill."). Indeed, the idea that complications may arise through no negligence of a physician is so ingrained in our jurisprudence that it is often included as part of the instructions to the jury.

209 A.3d at 315. Also, "'[t]he art of healing frequently calls for a balancing of risks and dangers to a patient. Consequently, if injury results from the course adopted, where no negligence or fault is present, liability should not be imposed upon the institution or agency actually seeking to assist the patient.'" *Id.* at 318. Thus, "[w]hile the occurrence of a known complication does not preclude a finding of negligence, conversely, negligence may not be inferred merely from the occurrence of a complication when such complication is known to occur without negligence." *Id.* at 320.

Under Pennsylvania law, proximate cause "may be established by evidence that a defendant's negligent act or failure to act was a substantial factor in bringing about the harm inflicted upon a plaintiff." *Jones v. Montefiore Hosp.*, 431 A.2d 920, 923 (Pa. 1981). "A plaintiff need not exclude every possible explanation, and 'the fact that some other cause concurs with the negligence of the defendant in producing an injury does not relieve defendant from liability unless he can show that such other cause would have produced the injury independently of his negligence.'" *Id.* "Thus, medical opinion need only demonstrate, with a reasonable degree of medical certainty, that a defendant's conduct increased the risk of the harm actually sustained, and the jury then must decide whether that conduct was a substantial factor in bringing about the harm." *Id.* at 924.

Additionally, Pennsylvania recognizes the doctrine of superseding cause:

"A superseding cause is an act of a third person or other force which, by its intervention, prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." Restatement (Second) of Torts § 440. *See Trude v. Martin*, 442 Pa. Super. 614, 627, 660 A.2d 626, 632 (1995). In addition a superseding cause must be an act which is so extraordinary as not to have been reasonably foreseeable. *Id.* . . . Superseding cause allows the unforeseeable acts of a third party, someone or something other

17

than the plaintiff or the defendant, to supplant the defendant's conduct as the legal cause of the plaintiff's injuries.

*Von der Heide v. Com. Dep't of Transp.*, 718 A.2d 286, 288 (Pa. 1998). "'In determining whether an intervening force is a superseding cause, the [Pennsylvania] Supreme Court . . . [has] stated: "The answer to this inquiry depends on whether the (intervening) conduct was so extraordinary as not to have been reasonably foreseeable, or whether it was reasonably to be anticipated."'" *Bleman v. Gold*, 246 A.2d 376, 380 (Pa. 1968).

Also, Pennsylvania permits the imposition of vicarious liability on a principal for an agent's negligence:

> "Vicarious liability, sometimes referred to as imputed negligence, means in its simplest form that, by reason of some relation existing between A and B, the negligence of A is to be charged against B although B has played no part in it, has done nothing whatever to aid or encourage it, or indeed has done all that he possibly can to prevent it." . . . Once the requisite relationship (i.e., employment, agency) is demonstrated, "the innocent victim has recourse against the principal," even if "the ultimately responsible agent is unavailable or lacks the ability to pay."

*Green v. Pennsylvania Hosp.*, 123 A.3d 310, 316 (Pa. 2015) (citations omitted).

Finally, Pennsylvania recognizes the doctrine of contributory negligence, but not as a complete bar to recovery in instances of death or injury to person or property. Pennsylvania's Comparative Negligence Statute reads, in part:

> In all actions brought to recover damages for negligence resulting in death or injury to person or property, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery by the plaintiff ... where such negligence was not greater than the causal negligence of the defendant ... against whom recovery is sought, but any damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff.

*Grove v. Port Auth. of Allegheny Cty.*, ___ A.3d ___, No. 31 WAP 2018, 2019 WL 5608707, at *6 (Pa. Oct. 31, 2019) (alterations in original) (citing 42 Pa. Cons. Stat. § 7102).

18

## C. *Dispositive Motions*

The Court has considered the evidence of record and concludes Defendants have presented persuasive evidence in their favor on the questions of whether they violated applicable standards of care, whether other Defendants' actions superseded particular Defendants' claimed negligence, whether Mrs. Logue was contributorily negligent, and whether any particular party's actions were a substantial factor, *i.e.*, the proximate cause, in bringing about Mrs. Logue's death. However, that evidence, albeit weighty, is not dispositive of the relevant issues, and genuine issues of material fact remain throughout. And, significantly, the Pennsylvania Supreme Court has noted that "'[t]he question of what is the proximate cause of an accident is almost always one of fact for the jury,'" *Bleman*, 246 A.2d at 380. This Court finds that the evidence, at this stage, is not so conclusive in Defendants' favor that it can be said that no genuine dispute of material fact exists and that Defendants are entitled to judgment in their favor as a matter of law. And it can also be said that sufficient evidence in Plaintiffs' favor exists to permit a reasonable jury to return a verdict for them—perhaps, ultimately, not as to all Defendants, but at least as to some. Further, the undersigned would inappropriately take on the role of fact-finder in order to determine whether superseding cause weighs in favor of some Defendants and against others. This case cannot be decided on summary judgement.

## V. *Conclusion*

In accordance with the Court's opinion, Defendants' motions for summary judgment (ECF Nos. 129, 132, 133) are DENIED. A conference call will be held with the Court on December 6, 2019, at 9:30 a.m., to establish a trial schedule for the case. Plaintiffs' counsel shall arrange for and initiate the conference call to chambers. In advance of the call, counsel should consult with their clients to determine whether they consent to referring this case to a magistrate judge of this

Court for all proceedings, including the conduct of trial and entry of final judgment. Further, counsel should consult with each other to determine whether the parties would like to re-engage in settlement discussions under Magistrate Judge Coulson's guidance.

The Clerk SHALL AMEND the docket to reflect the correct name of the corporate entity, Patient First Pennsylvania Medical Group, PLLC, in Civ. No. 17-2097 and to terminate Patient First Urgent Care, East York, as a party in the case.

DATED this 15 day of November, 2019.

BY THE COURT:

/s/ James K. Bredar
James K. Bredar
Chief Judge
